IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DAVID F. SHIPP                                                                    PLAINTIFF

vs.                                    Civil No. 5:21-cv-05065

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                      DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, David F. Shipp, brings this action pursuant to 42 U.S.C § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I.          Procedural Background

Shipp filed his applications for SSI and DIB on June 26, 2018, alleging an onset date of July 1, 2015, which was later amended to August 18, 2016.  (Tr. 12, 15, 112-113, 124-125, 136-137, 150-151).  He was 46 years old on the alleged onset date.  (Tr. 26, Finding 7).  He had past relevant work ("PRW") as a painter, roofer, and maintenance supervisor.  (Tr. 25, Finding 6).

The Commissioner denied his applications initially and on reconsideration.  (Tr. 166-172, 175-178).  At Plaintiff's request (Tr. 179-183), an Administrative Law Judge ("ALJ") held an

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

administrative hearing on May 26, 2020, via telephone.  (Tr. 57-107).  Plaintiff was present and represented by counsel.

On July 23, 2020, the ALJ found that Shipp had the following severe impairments: degenerative disc disease, depression, anxiety, rheumatic heart disease, chronic pain disorder, and a right knee impairment.  (Tr. 15, Finding 3).  The ALJ concluded that his impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 16, Finding 4).  The ALJ determined that Shipp retained the RFC to do the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except must work in a controlled environment (i.e., indoors).  He can occasionally stoop/bend, crouch, kneel, crawl, and balance. He should never climb ladders, ropes, or scaffolds.  He is able to perform simple, routine, and repetitive tasks with supervision that is simple, direct, and concrete. (Tr. 18, Finding 5).

With the assistance of a vocational expert ("VE"), the ALJ found Shipp could perform work as a cashier II and price marker.  (Tr. 26).  He concluded Shipp had not been under a disability as defined by the Act from July 1, 2015, through the date of the ALJ's decision, July 23, 2020.  (Tr. 27, Finding 11).

The Appeals Council denied Plaintiff's request for review on February 9, 2021.  (Tr. 1-4). He subsequently filed this action on April 9, 2021.  (ECF No. 1).  This matter is before the undersigned for report and recommendation.  Both parties have filed appeal briefs (ECF Nos. 14, 15), and the case is ready for decision.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it

adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A claimant must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy

given his age, education, and experience.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The fact finder only considers a claimant's age, education, and work experience in the light of his residual functional capacity if the final stage of the analysis is reached.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.    Evidence Presented

This Court's review of the medical record evidence reveals the following:

On July 11, 2016, Plaintiff was seen by Dr. Martha Morgan for complaints of an abdominal hernia.  (Tr. 694).  Plaintiff had suffered night sweats for 2-3 years and had occasional dizzy spells. He had rheumatic fever as a child and has a heart murmur.  He also has a history of a herniated disc in his low back, low back pain, and numbness into his left leg.  Dr. Morgan assessed Plaintiff with ventral hernia, night sweats, history of rheumatic fever and heart murmur, chest pain (unspecified), snoring, daytime sleepiness, history of herniated intervertebral disc, and skin lesions.  (Tr. 695-696).

On July 20, 2016, Plaintiff established care with cardiologist Dr. Ted Fish.  (Tr. 552). Plaintiff reported chest discomfort, dyspnea, lightheadedness, orthopnea, and palpitations with frequent episodes of moderate chest discomfort with pressure-like tightness quality localized to the left mid-parasternal and left lower parasternal regions.  Shortness of breath was aggravated by exertion, and Plaintiff had episodes of mild lightheadedness.   The orthopnea (sensation of breathlessness) prevented him from lying supine for the past 7 months.  There were no complaints of dizziness or loss of consciousness and he denied muscle cramps, loss of appetite, and bleeding. Dr. Fish assessed him with chest discomfort, rheumatic aortic disease, palpitations, and premature ventricular contractions ("PVCs").  (Tr. 554-55).

On August 11, 2016, Plaintiff underwent a transthoracic echocardiogram ("TTE") due to chest discomfort.  (Tr. 517-518).  According to Dr. Fish, Plaintiff had an estimated ejection fraction

("EF") of 55 to 60%.  (Tr. 520).  There was mild dilatation of the left atrium; moderate dilatation of the left ventricle; moderately severe aortic valve insufficiency; and mild to moderate mitral regurgitation.  On the same date, Plaintiff underwent a chest x-ray.  (Tr. 523).  Dr. Jarret Sanders opined Plaintiff's heart was enlarged but found no acute airspace disease.

On August 14, 2016, Plaintiff was admitted to Washington Regional Medical Center Hospital ("WRMC") for chest pain.  (Tr. 422-427).  He had some indigestion in his epigastric area and had a sensation of needle-like pains over his left anterior chest.  (Tr. 422).  An electrocardiogram ("EKG") showed sinus rhythm with PVCs, left ventricular hypertrophy ("LVH"), and nonspecific ST-T wave changes.  (Tr. 422-423).  He was subsequently admitted to telemetry for treatment and evaluation.  (Tr. 423).  According to Dr. Zubair Ahmed, Plaintiff's Holter monitor showed frequent PVCs and multiple runs of 2 to 7 beat wide-complex tachycardia, aberrancy, WPW, and occasional premature atrial contraction ("PAC").  A two-view chest x-ray revealed no acute airspace disease.  Dr. Ahmed noted Plaintiff was afraid of surgery and anxious in general.  Plaintiff's past medical history included rheumatic fever at age 12; ventral hernia; herniated disk; cardiac murmur; and a recent cracked tibia.  His medications consisted of Hydrocodone 10/325 mg and Tramadol, as needed.  It was reported that both of Plaintiff's parents had suffered strokes and diabetes and that his father has coronary artery disease.  Plaintiff was positive for palpitations and had gained 20 pounds over the last year.  Dr. Ahmed's impression was angina; murmur; history of rheumatic fever; hypertension, not previously diagnosed; anxiety; obesity; smokeless tobacco use; abnormal liver function tests ("LFTs"); and lipase.

Plaintiff underwent a transesophageal echocardiogram ("TEE").  (Tr. 442).  Due to technical limitations, not all segments on the left ventricle were visualized; however, the left ventricle septal wall thickness was normal.  (Tr. 442-443).  Plaintiff's estimated EF was 50 to 55%

and his right ventricle was normal in size and function.  (Tr. 443).  His left and right atrium were normal in size and there was no evidence of pericardial effusion.  There was mild thickening of the posterior mitral valve leaflet and mobility was severely decreased for the posterior leaflet.  Dr. Ahmed's diagnosis included left ventricular EF, by visual estimation of 50 to 55%; mild mitral regurgitation; mild mitral stenosis; mild thickening of the posterior mitral valve leaflet; myxomatous mitral valve; severely deceased posterior mitral leaflet mobility; and severe aortic regurgitation.

Three days later, on August 18, 2016, Plaintiff had another TEE.  (Tr. 440).  The left ventricular internal cavity was mild to moderately increased, the left ventricular septal wall thickness was normal, and there was mild left ventricular hypertrophy.  According to Dr. Frederick Isaacson, Plaintiff's estimated EF was 45 to 50%.  Plaintiff had mild to moderately increased left ventricular internal cavity size and a mildly dilated left atrium.  There was also severe aortic regurgitation and rheumatic mitral valve, and the pericardial effusion was anterior to the right ventricle.

The same date, Plaintiff underwent an aortic valve replacement using a 27 mm St. Jude medical prosthesis.  (Tr. 428).  Dr. Russell Wood noted Plaintiff had signs and symptoms of worsening acute systolic congestive heart failure.  Subsequent workup revealed severe aortic insufficiency, mild-to-moderate mitral regurgitation, and mild-to-moderate mitral stenosis. Postoperatively, Plaintiff did well but he continued to have shortness of breath.  (Tr. 426).  A chest x-ray showed some atelectasis.  A repeat echocardiogram ("echo") was ordered on August 23, but it was nondiagnostic due to extremely poor quality.  Upon discharge, Plaintiff was diagnosed with shortness of breath, chest pain, essential hypertension, rheumatic fever, ventral hernia, herniated

disk at L6, cardiac murmur, a recently cracked tibia on the right, and aortic valve stenosis.  (Tr. 425-426).

Plaintiff returned to Dr. Morgan on August 30, 2016, with complaints of pain and anxiety about his health; with respect to Coumadin, Plaintiff worried because he had an acquaintance who suffered a stroke while taking Coumadin. (Tr. 703).  Dr. Morgan assessed him with metallic aortic valve replacement, encounter for therapeutic drug level monitoring, and anxiety about health.  (Tr. 704-705).  Dr. Morgan increased his Clonazepam medication (three times a day).  (Tr. 705).

Plaintiff saw Dr. Fish on September 19, 2016, complaining of chest pain, palpitations, shortness of breath, and edema.  (Tr. 557).  He had swelling in his lower extremities and daily episodes of mild chest discomfort.  The chest pain was relieved by pain medication, but Plaintiff described slowly worsening mild dyspnea.  Shortness of breath was present at rest and aggravated by exertion, and he had frequent palpitations for 4 weeks without dizziness or loss of consciousness, muscle cramps, loss of appetite, or bleeding.  He was compliant with his recommend diet, level of exercise and medications.  He had abdominal obesity.  (Tr. 559-560). Dr. Fish assessed Plaintiff with chest discomfort, rheumatic aortic disease, palpitations, and PVCs.

The following day, on September 20, 2016, Plaintiff saw Dr. Morgan and reported significant anxiety related to Coumadin.  (Tr. 706).  Dr. Morgan determined Plaintiff would benefit from an antidepressant and prescribed Citalopram Hydrobromide 20 mg, tapering his Clonazepam medication. Dr. Morgan assessed him with metallic aortic valve replacement during hospitalization and anxiety disorder, unspecified.  (Tr. 708).  Dr. Morgan also refilled his Hydrocodone-Acetaminophen 10/325 mg and Clonazepam 0.5 mg.

On September 30, 2016, Plaintiff was admitted to WRMC for an evaluation of numbness. (Tr. 463).  His symptoms were localized, most severe to the right side of his face.  His body tingling

resolved but he had a sensation to his lower right face that felt like a toothache.  His cardiovascular exam included findings of regular heart rate and rhythm and sounds with click were present.  (Tr. 466).  There was no evidence of a stroke, and his symptoms likely arose from laying on his right side.  (Tr. 469).  Plaintiff underwent a computed tomography ("CT") perfusion, and a computed tomography angiography ("CTA") of his head and neck.  (Tr. 479).  Dr. Jong Park's impression was normal CT perfusion and a normal CTA of Plaintiff's head and neck.  Dr. Park opined Plaintiff's left parotid gland nodule measuring 1.5 cm could represent an enlarged lymph node in the parotoid gland or parotid gland mass such as a pleomorphic adenoma. and believed further evaluation was needed. Plaintiff was scheduled to follow up with an ENT.

Plaintiff saw Dr. Fish on November 1, 2016. (Tr. 562).  Plaintiff had bilateral lower extremity edema, chest pain, dyspnea, and palpitations with occasional episodes of mild chest discomfort which lasted approximately one minute each episode.  His palpitations occurred nightly with onset 1 week earlier. Plaintiff reported compliance with the recommended diet, level of exercise, and medications, and had no significant weight change since his last visit.  He was assessed with chest discomfort, rheumatic aortic disease, palpitations, and PVCs.  (Tr. 565).

Plaintiff returned to WRMC on November 7, 2016, for a chest x-ray.  (Tr. 462).  Dr. Barry Wetsell found Plaintiff's heart was enlarged, and prior median sternotomy was detected.  Plaintiff also had an elevated right hemidiaphragm but no pneumothorax.  Dr. Wetsell's overall impression was post-op mediastinal changes and no acute cardiopulmonary process.

Plaintiff returned to Dr. Fish on November 16, 2016, to review his Holter monitor data. (Tr. 567).  Plaintiff experienced dyspnea and palpitations but described gradually improving mild dyspnea.  Shortness of breath was present at rest and aggravated by exertion, but Plaintiff denied any recent chest pain, paroxysmal nocturnal dyspnea, orthopnea, or swelling in the legs.  The

Holter monitor revealed occasional PACs, occasional to frequent PVCs, several couplets, but no ventricular tachycardia ("VT"). Plaintiff's physical exam remained unchanged, and he was assessed with chest discomfort, rheumatic aortic disease, palpitations, and PVCs. (Tr. 569-470). Dr. Fish prescribed Metoprolol tartrate 50 mg (two times per day) and rescheduled an echo. (Tr. 570-571).

The following day, on November 17, 2016, Plaintiff returned to WRMC with chest pain. (Tr. 456). He had a TEE and his left ventricle estimated EF was 55 to 60%. (Tr. 457). Dr. Fish found mild hypokinesis of the intraventricular septum, opined Plaintiff's right ventricle was normal in size and function, and concluded Plaintiff had an abnormal echo. (Tr. 458).

Plaintiff returned to Dr. Fish on November 23, 2016. (Tr. 572). He denied any recent chest pain, shortness of breath, paroxysmal nocturnal dyspnea, orthopnea, or swelling in his legs, and Plaintiff's echo revealed an EF level of 55-60%. Dr. Fish found tilting disk mechanical prosthetic aortic valve, mild dilation of the left atrium, and trace mitral valve regurgitation. Plaintiff's physical exam remained unchanged, and he was assessed with rheumatic aortic disease, palpitations, chronic coumadin/warfarin therapy, PACs, and PVCs. (Tr. 574-575).

Six days later, on November 29, 2016, Plaintiff saw Dr. Morgan for a routine check-up. (Tr. 712). A recent echo looked good; however, an abnormality in Plaintiff's left parotid was noticed on a CTA of his head and neck from September. He complained of restless legs and anxiety from hearing the mechanical valve at nighttime. Plaintiff also reported pain lateral to his right knee and requested referral to an orthopedist for evaluation. Palpation lateral to the joint line of his right knee was tender and he had a large ventral hernia on his abdomen. (Tr. 714). Dr. Morgan assessed him with metallic aortic valve replacement, chest pain unspecified, anxiety about

health, pain in lateral portion of right knee, and restless leg syndrome.  Plaintiff's Hydrocodone was refilled, and Dr. Morgan increased his Clonazepam to 1 mg (two times a day).

On January 17, 2017, Plaintiff returned to Dr. Morgan.  (Tr. 716).  Plaintiff still had anxiety and knee pain, but his physical examination was otherwise unchanged.  He was assessed with pain in the lateral portion of his right knee, daytime sleepiness, snoring, metallic aortic valve replacement, fatigue, pain in right/left knee, chest pain, and other chronic pain.  (Tr. 718).  Dr. Morgan refilled Plaintiff's Hydrocodone-Acetaminophen and referred him to an orthopedic surgeon and pain management specialist.

Plaintiff returned to Dr. Morgan on February 6, 2017.  (Tr. 720).  Plaintiff had satisfactory results from Citalopram and Clonazepam but was experiencing irritation and discharge from his right eye.  His chest was tender on palpation, continued to have pain medially on the joint line of his left knee.  (Tr. 721).  He was scheduled for a sleep study and had returned to work for the first time since his heart surgery.  (Tr. 720).  Dr. Morgan assessed Plaintiff with metallic aortic valve replacement, other chronic pain, pain in lateral portion of right knee, anxiety about health, and conjunctivitis of left eye, unspecified conjunctivitis type.  (Tr. 722).

On February 15, 2017, Plaintiff returned to Dr. Fish, complaining of constant chest pain.  (Tr. 576).  It had a reported soreness quality, localized to the substernal region without radiation.  Plaintiff denied any recent shortness of breath, paroxysmal nocturnal dyspnea, orthopnea, or swelling of the legs.  He had no dizziness, palpitations, loss of consciousness, muscle cramps, loss of appetite, or bleeding.  Plaintiff was assessed with rheumatic aortic disease, palpitations, obesity, chronic coumadin/warfarin therapy, PACs, and PVCs.  (Tr. 578-579).  Dr. Fish ordered a chest x-ray, provided information on tobacco cessation, and prescribed Warfarin 5 mg with instructions to

alternate 5mg and 10 mg every other day.  (Tr. 579-580).  Dr. Fish noted Plaintiff was experiencing a lot of unexplained postoperative pain.  (Tr. 580).

On March 10, 2017, Plaintiff had a chest x-ray due to chest pain.  (Tr. 461).  Dr. Wetsell found Plaintiff's heart was normal in size and his impression was no acute cardiopulmonary process.

On March 22, 2017, Plaintiff saw to Dr. Fish, complaining of lightheadedness and musculoskeletal chest pain.  (Tr. 581).  Plaintiff had been unable to fully return to work since surgery and finances were a stressor.  At Plaintiff's request, Dr. Fish provided note saying Plaintiff had valve surgery and a difficult recovery.  Dr. Fish made no changes to his assessment and encouraged Plaintiff to continue to work toward being more active.  (Tr. 585).

Plaintiff next saw Dr. Fish on May 10, 2017, complaining of lightheadedness, bilateral lower extremity edema, and fatigue.  (Tr. 586).  The swelling was mild, and the lightheadedness infrequent.  Plaintiff had no changes in weight since his last visit and was eating a heart healthy diet most of the time; however, he used smokeless tobacco and was not taking Lasix due to work and the inconvenience of urinating.  (Tr. 588-589).  Dr. Fish noted in his patient instructions that Plaintiff was "a pretty nervous guy but he has gone back to work building fences with help on digging which is a good sign."  (Tr. 590).  Dr. Fish further instructed Plaintiff to take his Lasix daily for a few days then back to every other day.

Plaintiff returned to Dr. Fish on July 18, 2017, complaining of fatigue and chest pain.  (Tr. 591).  His physical examination was unchanged since his last visit and he was assessed with chest pain (treated by pain specialist), rheumatic aortic disease status post mechanical aortic valve replacement, vertigo, essential hypertension, obesity, chronic coumadin/warfarin therapy, PACs, PVCs, and fatigue.  (Tr. 593-594).  He was provided tobacco cessation material and referred to Dr.

Michael Eckles for sleep apnea.  (Tr. 594-595).  Between Plaintiff's arthritis, back and knee problems, heart disease, and general limited capacity for physical labor, Plaintiff intended to apply for disability which Dr. Fish thought was probably reasonable.  (Tr. 595).

Plaintiff next saw Dr. Wetsell on July 24, 2017, for a spine x-ray.  (Tr. 482).  Plaintiff's pedicles were grossly intact with marginal osteophytes at multiple levels.  There was no acute compression or subluxation, and vertebral spaces were preserved.  Dr. Wetsell's impression was no acute compression or subluxation.

Plaintiff presented to Dr. Gary Berner on August 3, 2017, to re-establish care.  (Tr. 727). Plaintiff wanted a refill for his Clonazepam medication because he ran out and had difficulty sleeping.  Dr. Berner assessed him with daytime sleepiness, general anxiety disorder, and anxiety about his health.  (Tr. 728).  Dr. Berner refilled Clonazepam 1 mg, Citalopram Hydrobromide 20 mg, and Zolpidem Tartrate 5 mg.  Plaintiff inquired about a taper of his medications.

On August 24, 2017, Plaintiff had a chest x-ray at WRMC.  (Tr. 514).  His heart was normal in size and there was prior median sternotomy but there was no pneumothorax, and his lungs were clear.  Dr. Wetsell's impression was no acute cardiopulmonary process.

Plaintiff saw Karen Pinkerton, APRN, on October 13, 2017, for a check-up.  (Tr. 730). Nurse Pinkerton assessed Plaintiff with generalized anxiety disorder, anxiety about health, insomnia due to medical condition, and pain in the lateral portion of his right knee.  (Tr. 730-731). Pinkerton increased Citalopram and prescribed Melatonin 5 mg. On October 19, 2017. Plaintiff then returned to Dr. Berner who decreased Clonazepam to nighttime only and referred Plaintiff to a pain management clinic, diagnostic sleep clinic, and ophthalmology evaluation.

On November 15, 2017, Plaintiff was admitted to WRMC with right-sided chest pain that radiated to his back.  (Tr. 502).  He also reported intermittent dyspnea and diaphoresis.  A 12-lead

EKG showed normal sinus rhythm.  (Tr. 503-504).  His chest films were negative with no infiltrates, no cardiomegaly, and no free air; although, his gallbladder ultrasound was abnormal and required follow-up.  (Tr. 504).  Plaintiff was assessed with cholecystitis, aortic valve disease, and chest pain.  He was prescribed Hydrocodone-Acetaminophen and Ondansetron.  Dr. Jennifer Turner ordered a chest x-ray which revealed Plaintiff's heart was mildly enlarged, and sternotomy wires were present.   (Tr. 512).   Radiologist Dr. Ralph Panek's impression was no acute cardiopulmonary abnormality and cardiomegaly.

On November 17, 2017, Plaintiff returned to WRMC due to right upper quadrant epigastric abdominal pain.  (Tr. 483-488).  Dr. Ronald Jay Mullis diagnosed Plaintiff with cholelithiasis, cholecystitis, and abdominal pain.   (Tr. 485). During Plaintiff's admission, Coumadin was discontinued, and he was placed on a heparin window after a period of several days.  When his Coumadin effect wore off, he was taken to surgery for a laparoscopic cholecystectomy.  (Tr. 486). Plaintiff was discharged from WRMC on November 23, 2017, with principal diagnoses of cholelithiasis and cholecystitis and secondary diagnoses of mechanical heart valve with chronic anticoagulation therapy; congestive heart failure; coronary artery disease; hypertension; and melanoma.  (Tr. 485-486).

On January 8, 2018, Plaintiff presented to Dr. Cathy Luo and complained of low back pain. (Tr. 620).  He also had pain in his right knee from when he jumped off a porch and broke his right knee.  Any activity increased his pain, especially lifting, bending over, walking, and standing for more than an hour.  He attended physical therapy in the past which provided some relief.  Plaintiff had not been able to work full time since his aortic valve was replaced.  Plaintiff was taking Hydrocodone 10/325 mg once a day, but it did not control his pain.  His cervical spine was tender but otherwise had normal range of motion.  (Tr. 621).  Plaintiff's lumbosacral spine was tender;

and extending, lateral bending, and rotating increased his lower back pain.  (Tr. 621-622).  In addition, his lumbar spine range of motion was decreased, and he had positive straight leg tests bilaterally.  (Tr. 622).  His reflexes and senses were normal, and he was able to stand without difficulty; however, his gait was antalgic.  He was assessed with lumbosacral/thoracic radiculitis, displacement of lumbar intervertebral disc (without myelopathy), chronic pain syndrome, and lower leg joint pain.  Dr. Luo prescribed Hydrocodone-Acetaminophen 10/325 mg twice a day and scheduled him for an epidural steroid injection.  (Tr. 623).

On January 20, 2018, Plaintiff underwent a chest x-ray.  (Tr. 501).  His cardiac silhouette was enlarged, and he had prior midline sternotomy changes.  Dr. Park noted there was possible mild pulmonary edema; however, there was no pleural effusion or pneumothorax, and Plaintiff's trachea was midline.  Dr. Park's impression was cardiomegaly and possible mild pulmonary edema.

Plaintiff returned to Dr. Luo on February 6, 2018, with back pain, leg pain, shoulder pain, hip pain, headache, abdominal pain, knee pain, ankle pain, pelvic pain, upper extremity pain, and sacral pain.  (Tr. 618).  Plaintiff stated his medication was working and he requested refills.  He reported pain in his lower back and right knee which was described as sharp and constantly burning.  Dr. Luo noted Plaintiff's ability to perform activities of daily living with pain medication.  His paraspinal musculature and facet joint were tender to palpation and his cervical spine manifested a decreased range of motion.  (Tr. 618-619).  His lumbosacral spine revealed paraspinal musculature and his facet joints were tender to palpation.  (Tr. 619).  Extending, lateral bending, and rotating also increased his lower back pain.  Plaintiff had positive straight leg raise tests bilaterally but his reflexes, sensation, motor strength, and gait were all normal.  Plaintiff was assessed with lumbosacral/thoracic radiculitis, lumbar herniated nucleus pulposus ("HNP")

(without myelopathy), radiculitis, chronic pain syndrome, and lower leg joint pain.  Dr. Luo prescribed Hydrocodone-Acetaminophen 10/325 mg once every twelve hours as needed for pain for 30 days.  Dr. Luo administered an epidural steroid injection without any complications.  (Tr. 616).

On February 8, 2018, Plaintiff saw Dr. Fish complaining of shortness of breath.  (Tr. 596).  His shortness of breath was present at rest and aggravated by exertion. (Tr. 598-599).  Dr. Fish and Plaintiff discussed weight loss and discussed attention to his international normalized ratio ("INR") with any change in health, diet, or medications.  (Tr. 600).  Dr. Fish prescribed Warfarin 5 mg oral tablet alternating 5 mg and 10 mg every other day and ruled out sleep apnea.  (Tr. 599-600).

Plaintiff returned to Dr. Luo on March 14, 2018. (Tr. 624-625).  He reported his knee pain woke him during the night.  (Tr. 624).  He also inquired about a knee brace and presented with an antalgic gait.  (Tr. 624-625).  Dr. Luo assessed him with the following: lumbosacral/thoracic radiculitis; lumbar HNP (without myelopathy); radiculitis; chronic pain syndrome; acute internal derangement of the right knee; chronic pain in the right knee; and other chronic pain.  (Tr. 624-625).  Dr. Luo ordered a urine drug screen (Tr. 626-628), and prescribed Hysingla ER 20 mg every twenty-four hours.  (Tr. 625).  Plaintiff's prescription for Hydrocodone was also refilled and Dr. Luo ordered a knee brace to help support weak muscles/joints, restrict mobility, and decrease pain.

Plaintiff returned to Dr. Berner on March 29, 2018.  (Tr. 736).  His physical exam remained unchanged, and he was assessed with anxiety about health, metallic aortic valve replacement, and snoring.  (Tr. 737).  Dr. Berner decreased Plaintiff's Clonazepam 1 mg to 1/2 a tab, and refilled Citalopram Hydrobromide 40 mg.

On April 12, 2018, Plaintiff returned to Dr. Luo for an epidural steroid injection and follow-up appointment.  (Tr. 629-633).  Plaintiff was taking Ambien which was not working well.  (Tr. 629).  He was scared to take Hysingla and Hydrocodone because his pharmacist warned him about accidental overdose.  He wanted to stop Hysingla and increase Hydrocodone, denying any adverse effects of his medications. His physical exam and assessment were unchanged and Dr. Luo prescribed Narcan 4 mg and Belsomra 15 mg.  (Tr. 629-630).  She also refilled Hysingla ER 20 mg and Hydrocodone-Acetaminophen 10/325 mg and placed Plaintiff on high-risk monitoring because he was a candidate for chronic opioid therapy.

On May 9, 2018, Plaintiff returned to Dr. Fish with palpitations, chest pain, shortness of breath, and lightheadedness.  (Tr. 601).  Plaintiff reported frequent episodes of moderate chest discomfort and aching pain when he coughed.  Dr. Fish noted orthopnea prevented Plaintiff from lying supine but had been present for many years and was nonprogressive.  Plaintiff had gained 9 pounds since his last visit and had been sedentary.  (Tr. 603-605).  Dr. Fish opined Plaintiff needed to lose weight.  (Tr. 605).

On May 14, 2018, Plaintiff saw Dr. Luo for a follow-up appointment.  (Tr. 634).  Plaintiff reported his last epidural steroid injection was 75% effective, but that his current medications were not working well.  He claimed his extended-release medication did not help his pain. He was scheduled for hernia surgery. Dr. Luo increased Plaintiff's Hysingla ER 40 mg and refilled his Hydrocodone-Acetaminophen 10/325 mg.

Plaintiff next saw Dr. Luo on June 13, 2018, and stated his Hysingla medication was not working well and that Belsomra did not help him sleep.  (Tr. 636).  He complained of pain in his chest, knees and lower back.  His pain before taking medication was 9/10 and after medication was 2/10.  Dr. Luo refilled his Hydrocodone-Acetaminophen prescription.  (Tr. 636-637).

16

Plaintiff returned to Dr. Luo on July 16, 2018.  (Tr. 641).  In addition to reported pain, Plaintiff admitted sleeping problems. (Tr. 641-642).  Dr. Luo refilled Belsomra 15 mg and Hydrocodone-Acetaminophen 10/325 mg and she discontinued Hysingla ER 40 mg.  (Tr. 642).

On July 25, 2018, Plaintiff saw Dr. Fish complaining of palpitations, chest pain, shortness of breath, lightheadedness, fatigue, orthopnea, cold sweats, and not sleeping well.  (Tr. 606).  An EKG revealed abnormalities and he was assessed with chest pain (treated by pain specialist), rheumatic aortic disease, vertigo, essential hypertension, obesity, chronic coumadin/warfarin therapy, PACs, PVCs, fatigue, daytime sleepiness, and acid reflux.  (Tr. 608-609).  Plaintiff's INR was 2.3 and Dr. Fish recommended Plaintiff get evaluated for a diagnosis of diabetes mellitus ("DM") given polyuria, dypsia, aphasia, and diaphoretic spells.  (Tr. 610).  Dr. Fish discontinued Omeprazole 20 mg, continued Metoprolol Tartrate 50 mg (twice a day), and continued Warfarin 5 mg (daily).

Plaintiff presented to Dr. Berner on August 20, 2018, for medication refills.  (Tr. 738).  He continued to struggle at night with anxiety over his heart valve and he reported daily fatigue, even following 8-12 hours of sleep.  He wanted to start exercising more but was afraid to due to his hernia.  His physical exam remained unchanged, and he was assessed with anxiety about his health, generalized anxiety disorder, snoring, morbid obesity due to excess calories, and ventral hernia. (Tr. 739).  Dr. Berner refilled Plaintiff's Citalopram Hydrobromide 40 mg and Clonazepam 1 mg 1/2 tab and educated Plaintiff on reasons to taper away from benzodiazepines.   Dr. Berner instructed Plaintiff to try melatonin to help with sleep and he was referred again to the Fayetteville Diagnostic Sleep Clinic and Dr. Mullis.

On October 1, 2018, Plaintiff had another TEE exam.  (Tr. 650).  Dr. Fish's summary was the following: estimated EF of 60 to 65%; left ventricle was normal in size and systolic function;

mechanical prosthetic aortic valve; trace tricuspid valve regurgitation; left ventricular diastolic dysfunction Grade 1; and mild aortic valve stenosis.  (Tr. 652).  Plaintiff's echo was normal.

The same day, Plaintiff had a chest x-ray.  (Tr. 655).  Dr. Wetsell noted Plaintiff's heart was enlarged and there were prior sternotomy changes, although there was no evidence of pneumothorax, his lungs were clear, and bony structures were intact.  Dr. Wetsell's impression was cardiomegaly, post-median sternotomy changes and no acute cardiopulmonary process.

Plaintiff saw Dr. Fish on October 10, 2018.  (Tr. 867).  Plaintiff's physical exam and assessment remained the same, but he reported dizziness which Dr. Fish believed was non-cardiac.  (Tr. 870-871).  A Holter monitor showed a 3 beat and 6 beat runs of VT.  Plaintiff had no significant ischemic heart disease, and his EF level was normal.  Plaintiff's prosthetic AV functioned normally on the echo.

On November 1, 2018, Plaintiff was admitted to WRMC complaining of substernal chest pain.  (Tr. 664).  Sharp pain started the day before and was lateral to the left sternal border.  The pain radiated directly straight through to his back with pain between the shoulder blades; Plaintiff reported he had never experienced that type of pain before.  He underwent an evaluation that included an EKG, chest x-ray, and laboratory work all of which was within normal limits including an INR of 2.5.  (Tr. 665).  A chest CT revealed a 4.1 centimeter ascending aortic aneurysm but there was no evidence of dissection.  Nonetheless, Dr. Adam Chandler admitted Plaintiff for overnight observation.  (Tr. 665-666).  After performing a CTA scan, Dr. Sanders found no evidence of aortic dissection, except there was mild aneurysmal dilation of the ascending aorta measuring 4.1 centimeters in diameter; a few scattered noncalcified pulmonary nodules; and non-united sternal osteotomy site.  (Tr. 680-681).  Dr. Fish's impression was Plaintiff had noncardiac chest pain, likely musculoskeletal, which may have been related to his sternum/back problems.

(Tr. 824).  Dr. Boris Bogomilov performed a consultation during Plaintiff's admission and opined Plaintiff had non-sustained ventricular tachycardia and paroxysmal supraventricular tachycardia, atrial tachycardia type unspecified with an aortic valve disease, chronic systolic heart failure, compensated herniated disk disease, hypertension, and chest pain.  (Tr. 828).

On November 6, 2018, Dr. Mullis successfully surgically repaired Plaintiff's hernia with a mesh-retro rectus mesh placement.  (Tr. 674, 678-679).

Plaintiff returned to Dr. Luo on November 21, 2018, complaining of break through pain. (Tr. 923).  Dr. Luo refilled his Hydrocodone-Acetaminophen prescription, discontinued Belsomra 15 mg, Evzio 2 mg, and Narcan 4 mg.  (Tr. 924).

On December 13, 2018, Plaintiff had an x-ray of his lumbar spine.  (Tr. 745).  Dr. Michael Flick found no fracture or dislocation and concluded Plaintiff's soft tissues were normal. Plaintiff's alignment was also intact, except there was mild facet degenerative change at L4-L5 and L5-S1 without significant evidence of degenerative disc disease.  Dr. Flick's impression was mild facet degenerative arthrosis at L4-L5 and L5-S1.  Plaintiff also underwent an x-ray of both knees.  (Tr. 746).  His right knee revealed mild tricompartmental degenerative disc disease worst in the lateral femoral tibial compartment.  His left knee showed findings of early degenerative arthrosis, but the left knee joint space was within normal limits.  Dr. Flick's impression was mild degenerative disc disease of the right knee, worse in the lateral femoral tibial compartment.

On January 9, 2019, Plaintiff returned to Dr. Fish reporting shortness of breath and fatigue. (Tr. 832).    There are notes from the Fayetteville Community Clinic/Center for Chest Care describing that Plaintiff's lung nodules were three millimeters and the Clinic would intervene if they reached five.  An EKG was not performed; a recently performed echo revealed an estimated EF of 60 to 65%; normal left ventricle size and systolic function; mechanical prosthetic aortic

valve; trace tricuspid valve regurgitation; left ventricular diastolic function grade 1; and mild aortic valve stenosis.  He was assessed with chest pain (treated by pain specialist), rheumatic aortic disease status post aortic valve replacement, dyspnea, vertigo, essential hypertension, obesity (BMI 39), chronic coumadin/warfarin therapy, PVCs, fatigue, acid reflux, and lung nodules.  (Tr. 836).

On January 22, 2019, Plaintiff saw Dr. Luo, reporting his medications were not working well along with pain in his right knee, lower back and chest.  (Tr. 932).  Dr. Luo prescribed Oxycodone 10 mg and discontinued Hydrocodone-Acetaminophen.  (Tr. 933).  Plaintiff returned to Dr. Luo on February 21, 2019, again reporting his medication was not working well. Dr. Luo increased Plaintiff's Oxycodone prescription to 15 mg.  (Tr. 936-37).  Plaintiff made the same complaints to Dr. Luo on April 22, 2019.  (Tr. 938).  Dr. Luo increased Plaintiff's Oxycodone to 20 mg and scheduled him for lumbar medial branch blocks.  (Tr. 939).

On June 7, 2019, Plaintiff was seen by Dr. Samuel Hester for a mental diagnostic evaluation.  (Tr. 751-757).  Dr. Hester opined Plaintiff has issues with concentration and focus but no history of psychosis, and no current symptoms of psychosis were noted.  (Tr. 751).  Plaintiff reported sadness, loss of motivation and drive, unprovoked tearfulness, insomnia, and suicidal ideations with no intent and no homicidal ideations.  He felt easily overwhelmed with history of panic attacks with chest tightness, shortness of breath, heart palpitations, and feeling the need to flee.  Insufficient personality traits were observed to warrant the diagnosis of a personality disorder.  (Tr. 752).

Plaintiff reported living with his wife and son, and that he had a 12th grade education with no degree.  (Tr. 752).  He had no history of problems getting along with others in the workplace and never lost a job due to mental problems.  He had not worked since 2015, which was just prior

to valve replacement/heart surgery.  (Tr. 753).  Plaintiff was appropriately dressed and groomed but morbidly obese.  His hygiene was good, though he was in pain when sitting and standing and he ambulated slowly.  Plaintiff displayed a good attitude and was cooperative, but his mood was depressed.  He did not show any abnormalities in fluency, rate, or volume.  His communication was effective, and his thought process was logical with no looseness of associations.  Plaintiff did not display any overvalued ideas, bizarre obsessions, or preoccupations. (Tr. 754).  He did report suicidal ideations with no intent but no homicidal ideation.  He was alert and fully oriented in all spheres and was able to perform his serial threes with ease and add and subtract single digits with ease. (Tr. 755).  Dr. Hester concluded Plaintiff was not functioning within or near the intellectual disability range.

Dr. Hester noted Plaintiff was able to drive short distances but rarely.  (Tr. 756).  He was able to perform many activities of daily living but needed assistance with tying shoes, clipping toenails, and zipping at times.  He does not do any of the shopping nor bill paying and does not participate in social groups.  Dr. Hester further opined Plaintiff has the capacity to communicate and interact in a socially adequate manner and the capacity to communicate in an intelligible and effective manner.  Dr. Hester also found Plaintiff could cope with the mental demands of basic work tasks, but it would be manual labor that he is likely not able to perform in a timely manner. (Tr. 756-757).  Plaintiff can attend and sustain concentration on basic tasks and can sustain persistence in completing tasks.  (Tr. 757).  Dr. Hester noted that Plaintiff may not be able to complete work tasks within an acceptable time frame.  Plaintiff gave adequate effort and was cooperative during the evaluation. (Tr. 757).  There was no evidence of malingering and Dr. Hester affirmed Plaintiff could manage funds without assistance.

Plaintiff next saw Dr. Berner on June 17, 2019.  (Tr. 797).  Plaintiff was using his CPAP nightly but recently stopped and was not sleeping well.  His physical exam was normal, and he was assessed with generalized anxiety disorder.  (Tr. 798).  Dr. Berner prescribed Celexa 40 mg (once a day) and stopped Citalopram Hydrobromide 40 mg.

Plaintiff returned to Dr. Fish on the following day, complaining of bilateral lower extremity edema, chest pain, dyspnea, and fatigue.  (Tr. 837).  He had gained four pounds since his last visit and was active but did no formal exercise.  Dr. Fish's assessment was unchanged, and he ordered a basic metabolic panel, complete blood count ("CBC"), and chest x-ray.  (Tr. 841).  Dr. Fish also concluded Plaintiff's heart sounded okay except he sleeps poorly and was depressed.

On June 19, 2019, Plaintiff returned to Dr. Berner for medication refill.  (Tr. 800).  He was assessed with primary osteoarthritis of the right knee.  (Tr. 800-801).  Dr. Berner also discussed the dangers of opioids especially given Plaintiff's high dose in the context of his multiple medical co-morbidities.  (Tr. 801).  Dr. Berner expressed a need to work with Plaintiff to reduce his dose but not cause withdrawals and reduced his medication by 1/3.  Plaintiff was referred to an orthopedic surgeon.

On August 19, 2019, Plaintiff was seen by to Dr. Luo.  (Tr. 943).  According to Dr. Luo's treatment notes, Plaintiff drove himself to the clinic and confirmed his medication was working well.  Dr. Luo scheduled him for a caudal epidural steroid injection and directed Plaintiff to see their education nurse for education regarding long-term opiate use for chronic pain.

Plaintiff next saw Dr. Fish on September 18, 2019, complaining of chest pain, shortness of breath, lightheadedness, paroxysmal nocturnal dyspnea, and palpitations.  (Tr. 844).  Plaintiff was not wearing his CPAP, stating he required a new mask.  (Tr. 848).  His assessment was unchanged. (Tr. 847-848).  Dr. Fish prescribed Amoxicillin 500 mg and Narcan 4 mg.  (Tr. 848).  Plaintiff's

INR was 1.9 and Dr. Fish increased his Warfarin from 5 mg daily to 7.5 mg three days a week and 5 mg 4 days a week.

Plaintiff returned to Dr. Luo on October 18, 2019, and indicated his medication was working well.  (Tr. 949).  He drove himself to the clinic and denied any side effects from medications.  Plaintiff reported he could do some activities of daily living with pain medication.  Dr. Luo prescribed Tizanidine 4 mg, refilled Oxycodone, discontinued Gabapentin and ordered an MRI.  (Tr. 950-951).  Dr. Luo noted Plaintiff would see the education nurse that day.  (Tr. 951).

Plaintiff saw Charla Watkins, DNP, on November 8, 2019, and reported decreased interest in activities such as being outdoors, spending time with his family, and feeling guilty for the previous 3-4 months.  (Tr. 989).  He had low energy, decreased concentration, and was often sleeping twelve hours per day.  He rated his anxiety level at a 5 and had not recently worn his CPAP.  Plaintiff was taking Citalopram 40 mg for depression but felt it was not working for him.  Dr. Watkins assessed Plaintiff with major depressive disorder (severe), generalized anxiety disorder, coronary artery disease, and sleep apnea.  Dr. Watkins's plan was to conduct Gene Sight testing, then slowly modify his antidepressant therapy; refer Plaintiff for fitting of a new CPAP mask; and for establish three small measurable goals for Plaintiff to work on.  (Tr. 989).

On December 18, 2019, Plaintiff returned to Dr. Luo, reporting his medication was working okay.  (Tr. 957).  Dr. Luo refilled his prescriptions and scheduled him for a lumbar medial branch block.  (Tr. 958-959).  Dr. Luo also noted if Plaintiff had satisfactory results from his lumbar medial branch block, then he would be a suitable candidate for lumbar rhizotomy.

On February 17, 2020, Plaintiff was seen by Dr. Luo, complaining of lower back pain, bilateral knee pain, and pain in his hips and chest.  (Tr. 963).  He reported difficulty sleeping and trouble walking due to lower back pain.  Dr. Luo discussed a recent MRI from December 19, 2019,

that revealed mild degenerative changes involving the lumbar spine, most significantly at L5-S1 with mild disc bulge and facet arthropathy. Dr. Luo further noted grade I retrolisthesis of L5 related to S1, which resulted in minimal central canal stenosis, right neuroforaminal stenosis and mild left neuroforaminal stenosis. Dr. Luo decreased Plaintiff's Oxycodone to 15 mg, refilled Tizanidine 4 mg, and scheduled him for a lumbar facet joint injection. (Tr. 963-964).

On March 18, 2020, Plaintiff returned to Dr. Fish with chest pain, shortness of breath, and orthopnea. (Tr. 849). Plaintiff was compliant with medication and had no significant changes in weight since his last visit; he presented anxious and worried. (Tr. 852-853). On the same date, Plaintiff underwent an MRI on his right knee. (Tr. 877). Dr. Tommy Hinton opined there was a 3.2 mm wide area of full-thickness chondromalacia (common condition causing pain in kneecap) involving the posterior lateral femoral condyle.

On March 19, 2020, Dr. Watkins, submitted a letter on behalf of Plaintiff. (Tr. 806). The letter stated, "[d]ue to his current status of major depressive disorder and fatigue [Plaintiff] is experiencing, he is unable to work at this time as he needs to be attending his medication management and therapy appointments."

On April 16, 2020, Plaintiff saw Dr. Watkins for a follow-up appointment. (Tr. 982). Plaintiff was assessed with major depressive disorder (severe), generalized anxiety disorder, grief, and problems with partner/spouse. He was prescribed Clonazepam 1 mg (twice a day).

On April 23, 2020, Dr. Fish submitted a letter on behalf of Plaintiff. (Tr. 807). In the letter, Dr. Fish stated the following:

> This is a 50-year-old gentleman with significant medical and cardiovascular problems. He has a history of rheumatic heart disease and in 2016 underwent replacement of his aortic valve receiving a mechanical aortic valve and requiring chronic Warfarin anticoagulation. His problems include chronic stage II to III diastolic congestive heart failure, morbid obesity and a chronic pain syndrome that I believe may be fibromyalgia and is managed by a pain specialist. He has easy

fatigability and severe shortness of breath with exertion.  His chronic discomfort and exercise limitation make it difficult for him to do any sustained activity.  (Tr. 807).

Orthopedist, Dr. Tom Coker, submitted a mental RFC assessment on behalf of Plaintiff on April 28, 2020.  (Tr. 992-993).  Dr. Coker's diagnosis was knee contusion.  (Tr. 993).  Regarding the RFC assessment, Dr. Coker did not check any boxes as to whether Plaintiff had no useful ability to perform certain acts on a sustained basis.  (Tr. 992).

On April 29, 2020, Dr. Berner submitted a letter on behalf of Plaintiff.  (Tr. 996). Specifically, Dr. Berner did not think Plaintiff's current state of medical conditions was consistent with being able to accurately perform a consistent work schedule.

Dr. Watkins submitted a mental RFC assessment on behalf of Plaintiff on May 20, 2020. (Tr. 997).  She concluded Plaintiff had no useful ability to function on a sustained basis in an 8-hour workday for 5 days in a full week in the following areas: remembering locations and work-like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, or being punctual with customary tolerances; sustaining an ordinary routine without supervision; responding appropriately to supervision, co-workers, and usual work settings; working in coordination with or proximity to others without being distracted by them; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; setting realistic goals or making plans independently of others; functioning independently; behaving in an emotionally stable manner; relating predictably in social situations; demonstrating reliability; working without deterioration

25

or decompensation causing the individual to withdraw from the situation; and working without deterioration or decompensation causing exacerbation of symptoms or adaptive behaviors.

On September 28, 2020, Dr. Coker submitted a physical RFC assessment on behalf of Plaintiff.  (Tr. 994-995).  Dr. Coker opined Plaintiff could frequently lift and/or carry 1/3 to 2/3 of a typical 8-hour workday more than 80 pounds.  (Tr. 994).  Dr. Coker also noted Plaintiff could occasionally lift and/or carry 1/3 to 2/3 of a typical 8-hour workday more than 50 pounds. According to Dr. Coker, Plaintiff could stand and/or walk 8 hours, sit 8 hours, and his ability for pushing and pulling was unlimited.  Plaintiff also needed work breaks or bathroom breaks 1 or 2 times during a typical 8-hour workday.  Plaintiff could perform any work activities in a normal workday for 8 hours and his postural limitations were 6/8 hours and manipulative limitations were 6/8 hours.  (Tr. 995).  Dr. Coker found no environmental limitations that applied to Plaintiff.

### IV.   Discussion

In his appeal brief, Plaintiff raises the following issues for reversal: (1) whether the ALJ fully and fairly developed the record; (2) whether the ALJ erred at Step Two of the sequential analysis; and (3) whether substantial evidence supports the ALJ's RFC determination.  (ECF No. 14, pp. 1-11).  After thoroughly reviewing the record, we find that substantial evidence does not support the ALJ's RFC finding.  Because we agree that the ALJ's RFC finding is unsupported by substantial evidence and remand is necessary, the other issues of concern will not be addressed.

RFC is the most a person can do despite that person's limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  It is defined as the individual's capacity for work activity "on a regular and continuing basis."  20 C.F.R. §§ 404.1545(b), (c) and 416.945(b), (c).  A disability claimant has the burden of establishing his RFC. *Vossen*, 612 F.3d at 1016.  The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records,

observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

Over the course of approximately 4 years, as evidenced by portions of the record recited herein, Plaintiff was treated by multiple physicians and admitted to the hospital on numerous occasions. In addition to heart disease, chronic pain disordered, degenerative disc disease and a right knee impairment, Plaintiff suffered with worsening depression and anxiety. Naturally, there are instances in the record that reveal some overall improvement regarding Plaintiff's impairments, but the medical record as a whole is replete with evidence manifesting the continuity and severity of Plaintiff's physical condition during the relevant disability period. Physical exams from Plaintiff's pain treatment specialist consistently exhibited a restricted range of motion in areas of his spine, antalgic gait, and positive straight leg raise tests bilaterally. Plaintiff's medications were constantly adjusted but at no time was Plaintiff without a myriad of medications, including medications for pain. Plaintiff continued to have chest pain, shortness of breath, and edema after his valve replacement surgery, including a confirmed non-union of his sternum identified in a CT scan from November 2018. (Tr. 680-681).

The ALJ determined Plaintiff was able to perform light work with limitations. Having reviewed and considered the record, the RFC does not adequately account for the functional limitations imposed by Plaintiff's undisputedly severe physical impairments.  The ability to perform light work requires the ability to stand and walk for a total of six hours out of an eight-hour workday. *See* SSR 83-10, 1983 WL 31251, *5-*6.  Despite Dr. Coker's opinion, the entirety of record currently before this Court does not make clear that Plaintiff could do so.  Given the severity of Plaintiff's physical impairments in combination with his obesity, the Court believes remand is necessary for the ALJ to develop the record more fully and fairly regarding Plaintiff's physical RFC for the time period in question.  The Court also finds that, upon remand, a physical consultative examination is necessary to determine the restrictions imposed by Plaintiff's impairments. With this additional information, the ALJ should reassess Plaintiff's RFC, considering all of Plaintiff's impairments, and conduct a thorough sequential evaluation analysis.

### V.      Conclusion

Based upon the foregoing, it is recommended that the Commissioner's decision denying benefits be reversed and remanded for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of April 2022.

*Christy Comstock*

CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE